**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| JAMES LUCIEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:24-cv-11341 |
| v. | ) | |
| | ) | |
| JOHN BRAZIL, *et al*. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS CITY OF BOSTON AND
BRATTON'S MOTIONS TO DISMISS**

Plaintiff, JAMES LUCIEN, under Federal Rule of Civil Procedure 12, responds to

Defendants Bratton and City of Boston's (COB or Boston) motions to dismiss (Doc. Nos. 28 and

32) as follows:

**INTRODUCTION**

Plaintiff seeks redress for decades of wrongful imprisonment for a murder that he did not

commit. The wrongful conviction stemmed from fabricated inculpatory "evidence" and

suppressed exculpatory evidence. Defendants Bratton and COB played key roles in Plaintiff's

wrongful imprisonment by intentionally hiding past and current evidence of misconduct by their

investigators and allowing them to continue their corrupt ways generally and in this investigation

particularly. These actions were consistent with the COB's failure to train and supervise its

officers and its deficient policies related to disclosing exculpatory evidence. Plaintiff brings

viable claims against Defendant COB under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658

(1978), and Defendant Bratton for supervisory liability under 42 U.S.C. §1983. Plaintiff's

Complaint properly spells out these allegations against these Defendants and there is no basis to

dismiss that Complaint against them.

1

**BACKGROUND**

**Defendants City of Boston and Bratton had Known Corrupt Officers**

Before Plaintiff was ever framed by him, Defendant Brazil and two other corrupt Boston Police Department (BPD) officers were involved in conspiracies to use their police power to enrich themselves at the expense of the citizens of Boston. *See United States v. Murphy*, 193 F.3d 1 (1st Cir. 1999). This misconduct was not secret to the BPD. Plaintiff's Complaint, Doc. No. 1, ¶106. Rather Defendant Brazil and these two other officers were the subject of multiple complaints of misconduct so that Defendant COB and/or its supervisors, including Defendant Bratton[1], were on notice that Defendant Brazil posed the very risk of behavior he engaged in here—fabricating inculpatory evidence and hiding/destroying exculpatory evidence. *Id*. Despite that notice, the COB and/or its supervisors did nothing to reign in Brazil or other investigators. *Id*.

In addition, Defendants, including Defendants COB and Bratton, were on express notice that Defendants Brazil, Foley, and Mahoney had engaged in investigatory misconduct before Plaintiff was wrongly arrested and prosecuted. *Id*., at ¶63. This includes notice of Defendants' personnel records, which were exculpatory because they contained the information about the

---

[1] Plaintiff did not identify Defendant Bratton by name as a supervisor in this paragraph, but the Complaint states claims against him based on his actions/inactions as a supervisor. At this stage, the Complaint is to be read broadly as a whole in deciding a motion to dismiss so that these allegations apply to Bratton. Moreover, as admitted by Defendant Bratton in his motion, he was the chief of police at the critical moment that Brazil and his fellow corrupt detectives could have been stopped. Doc. No. 33, at 5. Defendant Bratton did nothing. *See* Doc. No. 1, ¶106. Although not argued by Defendant (and therefore waived), Plaintiff's pleading against a group of supervisors puts them on sufficient notice under Federal Rule of Civil Procedure 8. *See Echavarria v. Roach*, No. 16-cv-11118-ADB, 2017 WL 3928270, at *3-4 (D. Mass. Sept. 7, 2017); *Cuadrado v. Wall*, No. CA 08-305 ML, 2010 WL 1499589, at *2 (D.R.I. March 9, 2010); *Carter v. Newland*, 441 F. Supp. 2d 208, 213-14 (D. Mass. 2006).

prior investigatory misconduct. *Id*. But Defendants COB and Bratton hid that Defendant Brazil had falsified affidavits and evidence in other cases, that he had failed to correctly document money, and that he had stolen money from other criminals and crime scenes before (and after) Plaintiff's trial. *Id*., at ¶60. Defendants Bratton and COB further suppressed that Brazil was engaged in: (1) an ongoing conspiracy; and (2) a pattern of egregious misconduct including falsifying search warrants, lying in investigations, failing to report seized cash, stealing money from criminals and crime scenes, ripping off drug dealers, making deals with criminals and their lawyers, misreporting money recovered from crime scenes so the officers could keep money, and retroactively substituting different money as evidence, if anyone ever came looking for the missing money, which is what Brazil did in Plaintiff's case. *Id*., at ¶61.

For his part, Defendant Foley had been on leave for lying previously in criminal investigations and for suffering mental health issues in which it was determined that he had trouble discerning truth from fiction. *Id*., at ¶107. Defendants COB and Bratton were aware of these issues and on notice that Foley posed the exact risk that occurred here—fabricating inculpatory evidence and hiding/destroying exculpatory evidence. *Id*. Despite that express notice, the COB and Bratton allowed Foley to infect other investigations, including the one that led to Plaintiff's wrongful arrest and conviction. *Id*.

Similarly, Defendant Mahoney had previously committed misconduct in investigating crimes that had resulted in wrongful arrests and/or convictions. *Id*., at ¶108. Defendants COB and Bratton were aware of these issues and were on notice that he posed the exact risk that occurred here—the fabrication of inculpatory evidence and the hiding/destruction of exculpatory evidence. *Id*. Like with Foley and Brazil, the COB and Bratton allowed Mahoney and other investigators to continue to violate investigation standards and suspects' rights. *Id*.

**Defendants COB and Bratton Tolerated Misconduct by These and Other Officers**

The reason that the COB did nothing to stem this misconduct is because it had a policy or custom of indifference to misconduct by BPD officers. *Id*., at ¶109. It failed to properly investigate complaints of misconduct and to discipline officers who engaged in misconduct. *Id*.

Part of this problem was caused by the COB's policy or custom of tolerating a "code of silence" or a "blue wall" in which Boston police officers understood that they were not to report misconduct by fellow police officers. *Id*., at ¶110. This policy or custom existed in the early 1990s, before Plaintiff's wrongful arrest and prosecution. *Id*., at ¶111. The scandals involving BPD Commissioner Dennis White and union president Patrick Rose demonstrate the power of the code of silence in the BPD at the time of Plaintiff's wrongful arrest and prosecution. *Id*. Both officers were investigated for serious misconduct (domestic abuse and sexual abuse of children) in the 1990's, but BPD officers protected them from any repercussions. *Id*.

There are other known examples of BPD's code of silence before and during Plaintiff's trial. *Id*., at ¶113. For instance, before and during Plaintiff's criminal trial, Michael Cox (the current BPD commissioner), a Black undercover police officer, was beaten by other Boston police officers who did not realize he was a fellow officer. *Id*. But not one officer came forward to identify the perpetrators of the misconduct. *Id*. This incident resulted in a successful civil suit and inspired a book, *The Fence*, by Dick Lehr. *Id*. This historical context demonstrates that even police-on-police misconduct was shielded by BPD officers through the custom within the BPD of fostering a code of silence or "blue wall" to hide misconduct. *Id*. Indeed, this custom protected BPD's own officers, like Defendants Brazil, Foley, and/or Mahoney, even more when it came to misconduct against non-police officers. *Id*. Defendant COB was aware of this custom and did nothing to prevent it as demonstrated by these known examples. *Id*.

Finally, on May 14, 2021, Boston Mayor Kim Janey admitted that "a blue wall of silence was confirmed" in the course of an investigation related to former Commissioner White's misconduct. *Id*., at ¶115. In speaking of the early 1990s, which is when misconduct caused Plaintiff's wrongful conviction, she said, "[O]fficers were intimidated into silence for fear of retaliation" during the investigation into allegations against Commissioner White,. *Id*.

That same protection extended to Defendant Brazil, who brazenly engaged in repeated thefts from suspects, thefts at crime scenes, fabricated evidence, and provided false evidence under oath. *Id*., at ¶112. Brazil knew that he could get away with this misconduct because the COB would turn a blind eye to it, and no fellow officer would report it. *Id*. It was only after the federal government became involved that there was any accountability, though not by the COB, which continues to pay John Brazil. *Id*.; *see also*, *Murphy*, 193 F.3d 1.

This blind eye also extended to Defendants Foley and Mahoney, who each were allowed by the COB to infect criminal investigations through fabrication of evidence and/or other misconduct. Doc. No. 1, at ¶112. Not only did the COB have a custom to protect rogue officers when complaints were made against them, the BPD also had a custom of making it difficult for citizens to file complaints about the conduct of Boston police officers in the first place. *Id*., at ¶115. The BPD's own review board found that there "is a strong perception that citizens do not have easy access to filing complaints in supportive and non-intimidating environments." *Id*.

Even when a citizen could navigate the system to make a complaint, BPD's Internal Affairs Division delayed findings. *Id*., at ¶116. This delay allowed misconduct to go unpunished, since the complaining civilian often could not be found or lost interest in the complaint by the time IAD was responsive. And even when investigations revealed misconduct against officers, including but not limited to Defendants Brazil, Foley, and Mahoney, the BPD and/or the

supervisors who had knowledge (including Defendant Bratton) took no steps to increase supervision of those officers, create added safeguards, and/or to remove them from their positions. *Id.*, at ¶117. The BPD and/or its supervisors (including Defendant Bratton) also concealed the misconduct generally and from Plaintiff specifically. *Id.* This enabled those officers to reoffend, which is what happened here in the fabrication and/or suppression of exculpatory evidence that led to Plaintiff's wrongful conviction. *Id.*

### These Corrupt Officers Fabricated Inculpatory Evidence Against Plaintiff and Suppressed Exculpatory Evidence

On June 25, 1994, Ryan Edwards was fatally shot once while sitting in the driver's seat of a car. *Id.*, ¶17. Plaintiff was in the backseat of the car when Mr. Edwards was shot, but did not shoot Mr. Edwards. *Id.*, at ¶18. Rather, someone from outside of the car shot Edwards. *Id.* Although mortally wounded, Edwards was alive long enough to talk to the police and said that he was shot by an unidentified person who was standing outside of his car. *Id.*, at ¶¶20-22.

No physical evidence ever tied Plaintiff to Edwards' murder, nor was there any physical evidence that Edwards was robbed, as claimed by the Commonwealth. *Id.*, at ¶19. To the contrary, the evidence supports that the shooting was committed by Alford Clarke, a drug dealer and Edwards' half-brother, who was standing outside of the car when the fatal shot was fired. *Id.*, at ¶23. Clarke fled the scene after the shooting and hid a handgun that he had used during the shooting. *Id.*, at ¶24.

Unfortunately for Plaintiff, disgraced BPD officer Defendant Brazil arrived on the scene to take over the investigation. *Id.*, at 27. Defendant Brazil's unlawful abuse of his police power, unchecked by the COB (as detailed above), were on full display in the investigation of the Edwards murder. *Id.*, at 29.

Some money in Edwards' possession was found inside Edwards' car. *Id.*, at ¶30. Brazil

stole that money, without submitting it for inventory, and concealed the amount of the money. *Id*.

Brazil also went to the hospital where Edwards was taken and tampered with evidence there. *Id*., at ¶32. Edwards' clothes were removed from him at the hospital, and it was Brazil's job to recover those clothes. *Id*. But Brazil did not recover Edwards' clothes, thus destroying important exculpatory evidence. First, those clothes contained money—and it was Brazil's *modus operandi* to steal money from crimes. *Id*., at ¶33. By taking the money, it denied Plaintiff the ability to undermine the Commonwealth's claim that Edwards was killed as part of a robbery. *Id*. Second, Edwards' clothes would have provided physical evidence supporting Edwards' dying declaration that he was shot from outside the car because the clothes would not have had gunshot residue on them, as they would have had the shot been fired from within the car. *Id*.

Instead, Defendant Brazil fabricated evidence of recovering a lesser amount of money from Edwards (thereby falsely implicating Plaintiff in a theft). *Id*., at ¶35. This faked amount was used against Plaintiff to support the Commonwealth's false claim that Plaintiff had robbed Edwards. *Id*. Defendants, including Defendant Brazil, also fabricated the recovery of an incriminating beeper from Edwards' car, which was also used against Plaintiff. *Id*., at ¶36.

Further physical evidence from inside the car was also destroyed by Brazil and the other investigators—the car was released without any gunshot residue testing from inside the car. *Id*., at ¶37. Such testing would have rebutted the Commonwealth's theory because an inside-the-car gunshot would have generated substantial physical evidence of a gunshot discharge. *Id*., at ¶38. Defendants denied Plaintiff that exculpatory physical evidence by releasing the car without testing it. *Id*.

Despite knowing of the officers' misconduct in this investigation, no supervisor from the BPD ever held Brazil or the other investigators accountable for removing the clothes or stealing the money from Edwards, which is consistent with Defendant COB's ongoing practice to look the other way when faced with misconduct by officers in the BPD and its lack of policies related to disclosing evidence. *Id*., at ¶¶34, 101-102.

Consistent with his unchecked history of stealing from drug dealers, Brazil attempted to forge an alliance with Clarke, thereby making Plaintiff the suspect. *Id*., at ¶39. Clarke admitted to Defendants Brazil and Mahoney that he had a handgun outside of Edwards' car when Edwards was shot. *Id*., at ¶41. Defendants hid this fact to shakedown Clarke for their profit. *Id*., at ¶42-43.

Defendants Brazil, Mahoney, and/or Foley then manufactured a story to hide that Clarke had a gun that matched the caliber of the fatal bullet. *Id*., ¶¶44-46. This fabricated story included a fake swap of weapons with another man who had his own criminal charges pending. *Id*., at ¶¶46-48. Defendant Brazil further protected Clarke by fabricating a story that Clarke's handgun had been thrown away, thereby preventing any ballistics evidence from it—including whether it was the matching caliber and/or whether the bullet that killed Edwards was fired from that gun. *Id*., at ¶49. The Defendant investigators further coerced two other people to provide false stories to implicate Plaintiff. *Id*., at ¶¶50-51.

### COB Had Nonexistent and/or Inadequate Policies

Plaintiff's wrongful arrest and conviction were caused by Defendant COB's policies, practices, and customs as they related to the BPD. *Id*., at ¶101. For example, the BPD maintained an unwritten custom or policy not to investigate exculpatory evidence and to withhold it from criminal defendants. *Id*. Plaintiff's wrongful conviction further resulted from the failure to supervise (as more stated above in more detail) and train Boston police officers regarding the

proper handling of exculpatory evidence and the government's obligation to disclose it to criminal defendants. *Id*., at ¶102. The City's failure to supervise and train its officers showed deliberate indifference to the risk that an innocent person like Mr. Lucien would be convicted of a crime he did not commit. *Id*.

Defendant COB further promulgated rules, regulations, policies, and procedures governing witness interviews, preservation and disclosure of investigative materials and evidence, questioning of criminal suspects, in-court testimony, preparation and presentation of witness testimony, and training, supervision, and discipline of employees and agents of the COB, including employees and agents of the BPD. *Id*., at ¶103. Defendant COB had notice of a widespread practice by its officers and agents of depriving individuals suspected of criminal activity, such as Plaintiff, of exculpatory evidence (including exculpatory evidence that its officers were corrupt, as detailed above), were subjected to criminal proceedings based on false evidence (as stated in more detail above, this includes the fabrication of evidence by corrupt officers), and were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved. *Id*., at ¶105.

### Plaintiff's Damages

On November 14, 1994, based on Defendants' falsified evidence and withheld/destroyed exculpatory evidence, Plaintiff was indicted for murder, two counts of armed robbery (for allegedly robbing Edwards and Clarke), and unlawful carrying of a firearm without a license (for allegedly possessing the gun that killed Edwards, which police never found and that Plaintiff never possessed). *Id*., at ¶64. Plaintiff contested guilt at every stage of his arrest and prosecution. *Id*., at ¶65. During the trial, the false evidence described above was the only support for

Plaintiff's wrongful convictions for murder, armed robberies, and possession of a weapon. *Id.*, at ¶67. Moreover, Plaintiff was unable to defend himself because he was denied access to the exculpatory evidence described above. *Id.*, at ¶68.

As a result of the suppression of the exculpatory evidence, Plaintiff was unable to rebut the prosecutor's sole argument against Plaintiff—that the murder stemmed from an armed robbery attempt. *Id.*, at ¶69. Had Plaintiff had the exculpatory evidence described above, he would have been able to establish that there was no armed robbery, that he did not possess the murder weapon, and that someone else committed the crime. *Id.*, at ¶70. In fact, had Defendants disclosed the exculpatory evidence they suppressed, Plaintiff never would have been arrested, let alone convicted. *Id.*, at ¶71.

Plaintiff was 21 years old—in the prime of his life—when he was wrongly arrested and convicted. *Id.*, at ¶72. He spent the next 26 plus years imprisoned for something he had not done. *Id.*, at ¶73.

## ARGUMENT

Defendants are not entitled to dismissal of Plaintiff's claims. In deciding whether to dismiss a complaint under Rule 12(b)(6), a court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citations omitted). A plaintiff, therefore, need only plead facts and causes of action fairly raised by these facts. *Snyder v. Collura*, 812 F.3d 46, 50 (1st Cir. 2016) (citations omitted); *see also* FED. R. CIV. P. 8. Under Rule 8, a complaint need only provide the Defendants with "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Indeed, "Rule 8(a) is not so rigid that it requires a plaintiff, without the benefit of

discovery, to connect every single alleged instance of misconduct in the complaint to every single specific officer." *Hyung Seok Koh v. Graf*, No. 11 C 2605, 2013 WL 5348326, at *4 (N.D. Ill. Sept. 24, 2013). To the contrary, "[s]uch a pleading standard would effectively allow police officers to violate constitutional rights with abandon as long as they ensured they could not be identified, even if liability for acting in concert (or for aiding and abetting each other) would otherwise apply." *Id*.

Accordingly, Plaintiff is not required to plead his claims with a high level of detail; rather, a complaint need only put a defendant on notice as to legal theories. *Cf. Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 24 (1st Cir. 2016) (explaining that Rule 8 does not "call for the pleading of exquisite factual detail"); *Rodríguez–Vives v. P.R. Firefighters Corps of P.R.*, 743 F.3d 278, 283 (1st Cir. 2014); *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 718 (1st Cir. 2014). To survive a motion to dismiss, a complaint, therefore, need only state a claim that is plausible on its face. *Twombly*, 550 U.S. at 570. That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555.

Dismissing a complaint is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Limone v. Condon*, 372 F.3d 39, 43 (1st Cir. 2004) (citations omitted). Moreover, where, as here, circumstances show that the defendants have sole possession of relevant information, pleading standards are relaxed. *See*, *e.g*., *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2nd Cir. 2008) (involving a post-*Twombly* challenge).

It is axiomatic that in evaluating a complaint, a court must "evaluate the cumulative effect of the factual allegations." *Ocasio-Hernandez*, 640 F.3d at 14; *see also Garcia-Catalan*,

11

734 F.3d at 103 ("We emphasize that the complaint must be read as a whole. As we have explained, '[t]here need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action.' For pleading purposes, circumstantial evidence often suffices to clarify a protean issue.") (quoting *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 55, 56 (1st Cir. 2013)). When Plaintiff's Complaint is read as a whole, instead of piecemeal as presented by Defendants in their motions, it passes the standards required by the Rules.

A.     **Plaintiff Properly Pleads Claims against Defendant City of Boston**

Defendant COB is liable under §1983 for due process violations suffered by Plaintiff that were caused by Boston's express policies or omissions of policy, the actions of its final policymakers, its failure to train or supervise employees, or a widespread custom or practice. *Monell,* 436 U.S. at 690-91; *Haley v. City of Boston*, 657 F.3d 39, 51-53 (1st Cir. 2011); *see also Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (*en banc*). Plaintiff properly pleads that the violations of his right to due process were caused by: (1) COB's failure to train and supervise its officers, including the express decision to allow its officers, including Brazil, Foley, and Mahoney, to investigate crimes despite knowledge that those officers engaged in the very type of misconduct that happened here; and (2) COB's omission of needed policies governing disclosing and preserving evidence and interviewing victims and witnesses.

1.     ***Haley* controls the reading of Plaintiff's *Monell* allegations.**

Plaintiff properly alleges that the COB had policies and practices that allowed officers to withhold material exculpatory and/or impeachment evidence and plant and fabricate physical and other evidence while simultaneously failing to supervise and train its officers, which also allowed an endemic "code of silence" to take shape and shield officer misconduct. Dckt No. 1, at ¶¶101-115. As a result, in repeated instances—including on multiple occasions in this very

case—BPD officers deliberately suppressed investigative materials; falsified and fabricated statements, evidence and testimony of witnesses; failed to maintain or preserve evidence; and pursued wrongful convictions through profoundly flawed investigations. *Id*. ¶ 105. Plaintiff's allegations are sufficient, especially given that this case demonstrates the consequences of these customs. *See also Bordanaro v. McLeod*, 871 F.2d 1151, 1161 (1st Cir. 1989) (explaining that "the jury could have considered the incident itself" in determining the policies and practices of the police department).

Boston's primary contention is that Plaintiff has not sufficiently pled his *Monell* claim. In making this argument, however, Boston overlooks *Haley*—which is the authoritative treatment of *Monell* claims at this stage. The City ignores that Plaintiff's allegations here closely mirror those in *Haley*—which the First Circuit found sufficient. Like the allegations here, the plaintiff in *Haley* alleged that the Boston Police Department "had a standing policy that was itself unconstitutional and that the City failed to train its personnel in their evidence disclosure obligations despite notice of persistent and ongoing violations." *Haley*, 657 F.3d at 51. The First Circuit concluded that those allegations were "sufficient to anchor two separate *Monell*-type claims, each demanding a different kind of proof." *Id*. Although the First Circuit expressly noted that the plaintiff would need to develop evidence in discovery to support those claims, it held that the allegations themselves were sufficiently pled for the plaintiff to proceed. *Id*.; *see also Echavarria v. Roach*, No. 16-cv-11118-ADB, 2017 WL 3928270, at *5 (D. Mass. Sept. 7, 2017) (relying on *Haley* to find analogous *Monell* allegations "sufficient to survive a motion to dismiss"). The same result should obtain here.

2. **Plaintiff properly pleads *Monell*-liability against Defendant COB that it failed to supervise and train its police officers, including Defendants Brazil, Mahoney, and Foley.**

Plaintiff claims in his Complaint that Defendant COB failed to sufficiently supervise and train its police officers. This is a properly pled stand-alone *Monell* theory. Boston is liable for failing to train and supervise its officers if it knew or should have known that its supervision and/or training was inadequate but exhibited deliberate indifference to the effects of those inadequacies by failing to implement supervision or training. *Young v. Providence*, 404 F.3d 4, 25-29 (1st Cir. 2005); *see also Haley*, 657 F.3d at 52. Municipal liability attaches under this theory without a pattern of similar constitutional violations, so long as it was obvious that a failure to supervise or train on a subject was likely to lead to the violation of constitutional rights. *City of Canton v. Harris*, 489 U.S. at 378, 390 (1989); *Young*, 404 F.3d at 28-29. As the First Circuit concluded in *Young*, a viable supervision or training *Monell* claim exists if there was a training or supervision deficiency in a particular area, and the constitutional injury inflicted by an untrained officer was closely related to that deficiency. 404 F.3d at 26-28.

To start, the Supreme Court has held that prior instances of misconduct are not always required for a failure to train claim. *See Bd of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 409 (1997); *Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989). In *Connick v. Thompson*, 563 U.S. 51 (2011), the Supreme Court contemplated one of the very situations presented here: failure to train officers regarding their *Brady* obligations. In *Connick*, the Court found no single-incident liability for failure to train *prosecutors* about *Brady* because prosecutors are legally trained and familiar with *Brady*. *Connick*, 563 U.S. at 63-71. The Court expressly distinguished attorneys from police officers: "The reason why the *Canton* hypothetical is inapplicable is that attorneys, *unlike police officers*, are equipped with the tools to find, interpret,

and apply legal principles." *Id.* at 69-70 (emphasis added); *id.* at 63 (explaining that legal training is what differentiates attorneys from other public employees).

For that reason, courts have repeatedly held that plaintiffs can even survive summary judgment, let alone at the pleading stage, on a single-incident failure to train *Monell* claim regarding *Brady* because the failure to train officers about their *Brady* obligations has the "highly predictable consequence" that a plaintiff's due process rights will be violated. *Vineyard v. County of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993) (*per curiam*); *Gregory v. City of Louisville*, 444 F.3d 725, 753 (6th Cir. 2006) ("At a minimum, Plaintiff has presented sufficient evidence to survive summary judgment on his failure to train allegations regarding exculpatory materials . . . This Court has held that evidence pointing to a City's failure to provide *any* training on key duties with direct impact on the constitutional rights of citizens is sufficient to survive summary judgment with a *Monell* failure to train claim.").

Courts in this Circuit accordingly recognize the viability of deliberate indifference claims without showing a prior pattern of constitutional violations based on the obvious need for training/supervision. *See Young*, 404 F.3d at 28 ("We have stated that '[t]he Supreme Court has left open the possibility that a failure-to-train claim can succeed without showing a pattern of previous constitutional violations.'") (quoting *Swain v. Spinney*, 117 F.3d 1, 11 (1st Cir.1997) (citing *Brown*, 520 U.S. at 409); *see also Echavarria v. Roach*, 565 F.Supp.3d 51, 91 (D. Mass. 2021). In *Echavarria*, relying on *Connick*, 563 U.S. at 64, the Court allowed a *Monell* claim to proceed to trial under a failure to train/supervise theory related to the obligation to disclose exculpatory evidence. It found that, even in the absence of a pattern of prior misconduct, "a reasonable jury could find that failing to train officers on their obligations to disclose exculpatory evidence leads to the highly predictable consequence that officers will not disclose exculpatory

evidence." *Id*.  The Court noted that police officers are not trained in the law, and it is obvious that they require training to comply with disclosure requirements. *Id*.

Here, Plaintiff sufficiently alleges that the constitutional violations resulting from not supervising/training investigators about their obligation to disclose exculpatory evidence was such an obvious consequence that it required that BPD provide those safeguards. He further alleges that Defendant COB was on actual notice that its officers, including but not limited to the three main investigators in the Edwards murder, were known to engage in investigatory misconduct and routine violation of *Brady*.  Doc. No. 1, ¶¶105-109. He further alleges that COB failed to supervise or provide training to rectify their misconduct. *Id*., at ¶¶102-103, 109, 119. Plaintiff's allegations, therefore, properly assert that COB's failure to train and/or supervise caused the constitutional violations inflicted by Defendants Brazil, Mahoney, and Foley. Doc. No. 1, at ¶¶101-121. As Plaintiff alleges, it was readily apparent to Boston that its failure to train and/or supervise police officers (like Defendants) in areas like intolerance of the widespread "code of silence," disclosure of evidence, preservation of evidence, and documenting witness interviews, would cause constitutional injuries in criminal investigations and prosecutions like the ones that Plaintiff suffered. *Id*.

Given Plaintiff's allegations and the long-established cases calling for police supervision and training on the core issues on which Boston provided no training and/or supervision (as demonstrated by, among other things, its decision to ignore the prior misconduct of its investigators here), Plaintiff sufficiently alleges deliberately indifferent to the need to supervise and/or train its officers and that this indifference caused Plaintiff's injuries. *See Young*, 404 F.3d at 28-29.

Notwithstanding this law, Defendant COB sets up a straw-man argument related to Plaintiff's alleged failure to plead evidence of a pattern of similar misconduct. Doc. No. 29, at 7-13. Defendant does this despite admitting that Plaintiff has other paths besides proving such a pattern to proceed with his *Monell* claim. *Id*., at 7-8. In fact, Plaintiff need only allege that the COB disregarded a known or obvious risk of serious harm in failing to supervise or train. *See Young*, 404 F.3d at 28.

Defendant COB is wrong that Plaintiff needs to plead allegations beyond those deemed acceptable in *Haley*. Even at the summary judgment stage, Plaintiff need only show some evidence of common knowledge within the BPD that it needed to supervise and/or train its employees for the case to proceed to trial on that issue. *Id*., at 28-29. Boston's claim that Plaintiff needs to plead facts well beyond that at this stage is a nonstarter. Plaintiff presents more than enough even if this were at the summary judgment stage to allege a common knowledge within the BPD and acquiescence to investigative misconduct—including the tolerance of a "code of silence."

Plaintiff pleads more than enough to allege this common knowledge and acquiescence to investigative misconduct—including knowledge that officers, including these very officers, were known to BPD supervisors; that no action was taken to rectify their misconduct; that these officers were allowed to conduct investigations (including the one involved here without any supervision or training intervention); and BPD's widespread tolerance of a "code of silence" to shield officers from misconduct. Doc. No. 1, ¶¶101-121. These allegations would be enough to get Plaintiff a trial on these subjects (*see Young*, 404 F.3d at 28-29)—they are more than enough at the pleading stage.

17

Plaintiff adequately pleads that the COB failed to supervise and/or train its officers so that it could be found liable under *Monell*. Plaintiff's allegations are akin to those identified in *Bordanaro*, which led the First Circuit to proclaim that "the jury was well within its discretion in finding that the recruitment, training, supervision, or discipline of [the defendant's] police officers was grossly and flagrantly deficient." 871 F.2d at 1159-61. Plaintiff's *Monell* claims should be allowed to proceed.

**3. Plaintiff properly alleges a *Monell* claim that Boston omitted needed policies causing the violation of Plaintiff's constitutional rights.**

> **a. Established law holds that Boston may be liable under *Monell* for its failure to adopt needed policies.**

Municipalities may be liable under 42 U.S.C. §1983 when they promulgate policies that are facially deficient in the face of actual or constructive notice that their programs present an obvious risk of harm. A decision not to adopt a needed policy gives rise to *Monell* liability because a "city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" *Connick*, 563 U.S. at 61-62 (quoting *City of Canton v. Harris*, 489 U.S. 378, 395 (1989) (O'Connor, J., concurring and dissenting in part)).

"The critical question under *Monell*, reaffirmed in *Los Angeles County v. Humphries*, 526 U.S. 29 (2010), is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson*, 849 F.3d at 379. Applying this principle, the courts of appeals uniformly have decided that "in situations that call for procedures, rules or regulations, the failure to make policy itself may be actionable." *Glisson*, 849 F.3d at 381; *see also Fields v. City of Chicago*, 981 F.3d 534, 562-63 (7th Cir. 2020) (affirming verdict finding municipality labile for failing to promulgate needed

policies requiring police to disclose evidence in the 1980s).

The First Circuit approved an omission-in-policy *Monell* theory at the motion-to dismiss stage in *Haley*, 657 F.3d at 51-53. Haley had been wrongly convicted in the early 1970s and served decades in prison before being exonerated when public records requests revealed Boston police had suppressed exculpatory statements from two key witnesses who had implicated Haley. *Id*. at 43-45. Haley sued the officers who investigated the case and the COB, and he alleged, among other things, that the standing policy of the BPD allowed officers not to disclose evidence in criminal cases. *Id*. at 51-52. In his complaint, Haley contrasted Boston's deficient evidence-disclosure policy "with that of the district attorney's office, which . . . had a standing policy to disclose all known exculpatory and impeachment evidence. . ." *Id*. at 52.

The First Circuit held that those allegations plausibly stated a *Monell* claim that "implicates the standing policy itself" and thus might render Boston liable on a theory "that a particular municipal action itself violates federal law[.]" *Id*. at 51-52. Boston's municipal action was a failure to promulgate evidence-disclosure policies that the city knew in the early 1970s were needed to avoid the due process violations that Haley had suffered. In that case, the COB "vigorously dispute[d] the accuracy of these allegations," but First Circuit held it was "neither the time nor the place to resolve the factual disputes between the parties." *Id*. at 52.

Applying this law, Plaintiff must show at this stage that his allegation adequately allege that Boston caused the due process violations that Plaintiff suffered by failing to adopt policies that the COB knew it needed. Plaintiff's Complaint meets this requirement. As stated above, the COB had a custom that allowed its investigators to conduct unconstitutional investigations with impunity and tolerated a department-wide "code of silence" to shield officer misconduct. These demonstrate the lack of policy requiring the full disclosure of exculpatory evidence, prohibitions

19

against fabricating evidence, and clear requirements to report misconduct. Indeed, Plaintiff alleges the absence of sufficient policies that led to the situation that caused Plaintiff's wrongful arrest and prosecution. Doc. No. 1, at ¶¶101, 103-104.

Plaintiff further alleges in his Complaint that Boston had ample notice it needed to promulgate policies governing police conduct in these areas but did not. This investigation occurred in 1993, and so this is not an ancient case where there might be some reasonable question about whether national standards for police practice had been established. This Court in *Haley* recognized that the BPD's lack of evidence disclosure policies in the 1970s was actionable. 657 F.3d at 51-53; *see also Fields*, 981 F.3d at 562-63 (same in the 1980s).

Plaintiff also properly alleges in his Complaint that Boston's omitted policies caused the violations of his rights. The causation allegation is quite direct in this case because Plaintiff alleges that each of the investigators themselves previously engaged in investigatory misconduct without any procedural guidelines by BPD. That they did so here is a natural cause of BPD's failure to institute those needed guidelines about evidence disclosure, documentation, and preservation of evidence.

Moreover, causation is a classic jury question. *Union Insurance Co. v. Smith*, 124 U.S. 405, 423 (1888). Deciding that allegation at this stage is premature. There are ample allegations in the Complaint to support the claim that the violations of Plaintiff's were caused by Boston's omission of needed policies requiring its police officers to disclose and preserve evidence.

The First Circuit recognized in *Haley* that municipal policies in the 1970s omitting needed procedures governing police disclosure of evidence stated a *Monell* claim. Plaintiff's Complaint presents *Monell* theories that are identical and analogous. As in *Haley*, Plaintiff's Complaint sufficiently states a claim against Defendant COB under *Monell*.

**B.**     **Plaintiff Properly Pleads Claims against Defendant Bratton**

**1.**     **Plaintiff properly alleges that Defendant Bratton's supervisory indifference caused the violations of Plaintiff's constitutional rights.**

Supervisors are liable under § 1983 for their own actions that result in violations of constitutional rights by a subordinate. *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6-7 (1st Cir. 1998). As discussed above, the Complaint sufficiently supports the conclusion that the Defendant officers (including the supervisors themselves) violated Plaintiff's rights. Similarly, the Complaint sufficiently alleges that those constitutional violations were caused by the deliberate indifference of the supervisor Defendants, including Defendant Bratton.

To succeed, Plaintiff must show that the constitutional violations he suffered were the foreseeable result of the supervisors' deliberate indifference to a substantial risk of harm. *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994). Deliberate indifference means a failure to take available measures to avoid a risk of harm of which the supervisor had actual or constructive knowledge. *Figueroa-Torres v. Toldeo-Davila*, 232 F.3d 270, 279 (1st Cir. 2000).

In addition, Plaintiff must allege a causal link between the indifference and the constitutional violations committed by the other Defendants. *See Feliciano–Hernández v. Pereira–Castillo*, 663 F.3d 527, 533 (1st Cir.2011) (quoting *Soto–Torres v. Fraticelli*, 654 F.3d 153, 158 (1st Cir.2011). Only in rare circumstances, can this question be decided without a jury, *Young*, 404 F.3d at 23, and causation in this context "need not take the form of knowing sanction, but may include tacit approval of, acquiescence in, or purposeful disregard of, rights-violating conduct." *Hoyos*, 151 F.3d at 7.

a. **Defendant Bratton was deliberately indifferent.**

To show a supervisor is deliberately indifferent, Plaintiff must ultimately establish: (1) "that the officials had knowledge of facts," from which (2) "the official[s] can draw the inference" (3) "that a substantial risk of serious harm exists." *Ruiz–Rosa v. Rullán*, 485 F.3d 150, 157 (1st Cir.2007) (alteration in original) (quoting *Calderon–Ortiz v. LaBoy–Alvarado*, 300 F.3d 60, 65 (1st Cir.2002)). Plaintiff's allegations spell out these requirements.

Plaintiff alleges that Bratton (among other supervisors) was on notice that BPD officers, including Defendants Brazil, Mahoney, and Foley, were the subject of multiple complaints of misconduct. Doc. No., at ¶¶105-106. This includes express notice that Defendants Brazil, Foley, and Mahoney had engaged in investigatory misconduct before Plaintiff was wrongly arrested and prosecuted. *Id.*, at ¶63.

Plaintiff pleads plenty of evidence (more than is required given that the facts and inferences are to be read in the light most favorable to Plaintiff) that Bratton could draw the inference of a substantial risk of serious harm. Bratton was on notice that Defendant Brazil had falsified affidavits and evidence in other cases and that he had failed to correctly document money and had stolen money from other criminals and crime scenes before (and after) Plaintiff's trial (the same conduct as here). *Id.*, at ¶¶60-61. Defendant Bratton was also directly aware that Defendant Foley had been on leave for lying in at least one other criminal investigation and had been found to be suffering from a mental health issue that caused him difficulty in discerning fact from fiction. *Id.*, at ¶107. Finally, Plaintiff alleges that Defendant Bratton was on notice that Defendant Mahoney had previously engaged in misconduct that resulted in wrongful arrests and prosecution. *Id.*, at ¶108.

It is not a defense that by the time that these investigators violated Plaintiff's rights, Defendant Bratton had already moved on to another department. Supervisors may be liable under 42 U.S.C. §1983 for a tort committed by a subordinate where the supervisors were aware of earlier complaints that pertained to individuals other than the plaintiff. *See Camilo-Robles v. Zapata*, 175 F.3d 41, 47 (1st Cir. 1999) (denying interlocutory appeal on summary judgment claim of qualified immunity, noting that these types of disputes hinge on factual determinations by a jury); *see also Vetter v. Dozier*, No. 06–cv–3528, 2010 WL 1333315, at *14 (N.D. Ill. March 31, 2010) (citing *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir.1996); *Shaw v. Stroud*, 13 F.3d 791, 799-800 (4th Cir.1994); *Gibson v. City of Chicago*, 910 F.2d 1510, 1523 (7th Cir. 1990) (in "a case alleging a failure to detect and prevent a subordinate's misconduct" summary judgment for the supervisor was improper).

Moreover, the "requisite causal connection" for liability under 42 U.S.C. §1983 can be satisfied "if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights." *Conner v. Reinhard*, 847 F.2d 384, 397 (7th Cir. 1988). *See also Hernandez v. Foster*, 657 F.3d 463, 487 (7th Cir. 2011); *Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir.1999); *Farris v. Kohlrus*, No. 17-cv-3279, 2023 WL 6445846, at *11 (C.D. Ill. Sept. 29, 2023) ("The [] jury could find that her responsibility—and her liability—were not vitiated by her departure."). The summary judgment decision in *Farris* is illustrative. There, the supervisor had changed jobs and argued that she could not, therefore, be liable for the later constitutional tort. The court disagreed and determined that only a jury could decide the causation issue. 2023 WL 6445846, at *11. Plaintiff's pleading of deliberate indifference against Defendant Bratton is similarly sufficient to meet these standards.

23

b.      **Defendant Bratton's deliberate indifference caused Plaintiff's harm.**

Plaintiff may show causation by alleging a "known history of widespread abuse sufficient to alert a supervisor to ongoing violations." *Maldonado–Denis v. Castillo– Rodriguez*, 23 F.3d 576, 582 (1st Cir.1994). Plaintiff pleads facts that establish that type of causation. Plaintiff pleads that Defendant Bratton was aware of the ongoing problems of investigation misconduct by BPD officers, including Defendants Brazil, Mahoney, and/or Foley and on notice that those officers posed the exact risk that occurred here—fabricating inculpatory evidence and hiding/destroying exculpatory evidence. *Id*., at ¶¶105-107. Despite that notice, Bratton did nothing to reign in BPD's officers. *Id*. Plaintiff's pleading of causation is sufficient. His claims of supervisor deliberate indifference against Defendant Bratton are viable and should proceed.

## CONCLUSION

Plaintiff states viable claims against Defendants City of Boston under *Monell* and against Bratton based on supervisor liability. His allegations put each on sufficient notice of the claims. Plaintiff's claims against each should be allowed to proceed to discovery. Dismissal of these claims is not warranted under the Rules.

WHEREFORE, Plaintiff asks that Defendants City of Boston and Bratton's motions to dismiss be denied. Should the Court believe that either of these motions have merit, Plaintiff asks for leave to file an Amended Complaint under Federal Rule of Civil Procedure 15(a)(2) ("The court should freely give leave when justice so requires"), to address any deficiencies in his allegations against either party.

RESPECTFULLY SUBMITTED,

JAMES LUCIEN

BY:   /s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

Mark Loevy-Reyes, BBO No. 707974
LOEVY & LOEVY
398 Columbus Avenue, Suite 294
Boston, MA 02116
(312) 243-5900
mark@loevy.com

## **CERTIFICATE OF SERVICE**

I, Mark Loevy-Reyes, an attorney, hereby certify that on September 23, 2024, I filed the

foregoing **PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS CITY OF**

**BOSTON AND BRATTON'S MOTIONS TO DISMISS** using the Court's CM/ECF system,

which effected service on all counsel of record.

/s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*