## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES LUCIEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:24-cv-11341 |
| v. | ) | |
| | ) | |
| BOSTON POLICE OFFICERS JOHN | ) | |
| BRAZIL, GEORGE FOLEY, WILLIAM | ) | |
| MAHONEY, BRIAN BLACK, ROBERT | ) | |
| MANNING, WILLIAM BRATTON, | ) | |
| JOSEPH V. SAIA, Jr., ROBERT P. | ) | **JURY TRIAL DEMANDED** |
| DUNFORD, JOSEPH DUNFORD, | ) | |
| EDWARD J. McNELLEY, HAROLD C. | ) | |
| PREFONTAINE, and UNKNOWN | ) | |
| BOSTON POLICE OFFICERS, and the | | |
| CITY OF BOSTON, | | |
| | | |
| Defendants. | | |

## AMENDED COMPLAINT

Plaintiff, JAMES LUCIEN, by his attorneys LOEVY & LOEVY, complains of

BOSTONPOLICE OFFICERS JOHN BRAZIL, GEORGE FOLEY, WILLIAM

MAHONEY, BRIAN BLACK, ROBERT MANNING, WILLIAM BRATTON,

JOSEPH V. SAIA, Jr., ROBERT P. DUNFORD, JOSEPH DUNFORD, EDWARD J.

McNELLEY, HAROLD C. PREFONTAINE, UNKNOWN BOSTON POLICE

OFFICERS, and the CITY OF BOSTON, as follows:

## INTRODUCTION

1.    Plaintiff James Lucien was wrongly accused and convicted of the1994

murder of Ryan Edwards.

2.      Plaintiff spent more than 26 years imprisoned for the murder, a crime that he did not commit. He was also wrongly convicted of armed robbery and unlawfully possessing a weapon based on the bogus murder conviction.

3.      There was no legitimate evidence connecting Plaintiff to the murder.

4.      Instead, Defendants fabricated evidence to quickly "solve" the case.

5.      To do this, they fabricated a false narrative from the possible murderer, Alford Clarke.

6.      To hide this false narrative, Defendants fabricated evidence to hide that Mr. Clarke possessed a handgun at the time of the murder that matched the caliber of bullet that killed Edwards.

7.      Plaintiff now seeks justice for the harm that Defendants caused and redress for the loss of liberty and the terrible hardship that Plaintiff has endured and continues to suffer because of Defendants' misconduct.

## JURISDICTION AND VENUE

8.      This action is brought under 42 U.S.C. § 1983 and Massachusetts law to redress Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

9.      This Court has jurisdiction of Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims under 28 U.S.C. § 1367.

10.      Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and the events and omissions giving rise to Plaintiff's claims

2

occurred within this judicial district. Moreover, on information and belief, many of the Defendants reside in Massachusetts and are subject to the personal jurisdiction of the courts in this judicial district.

## PARTIES

11.     Plaintiff James Lucien is a man who spent more than 26 years wrongfully imprisoned for crimes that he did not commit. Mr. Lucien is a college graduate whose life was greatly and adversely impacted by the events giving rise to this matter.

12.     Defendants Boston Police Department officers John Brazil, George Foley, William Mahoney, Brian Black, Robert Manning, and Unknown Boston Police Officers, (collectively "Boston Police Defendants") were all Boston police officers at the time of the events giving rise to this matter. These Defendants were responsible for investigating crimes, including the crime at issue in this case, and/or for supervising other police officer Defendants. They committed, facilitated, and approved the constitutional violations at issue in this case.

13.     Defendants Boston Police Department supervisors William Bratton, Joseph V. Saia, Jr., Robert P. Dunford, Joseph Dunford, Edward J. McNelley, Harold C. Prefontaine were all Boston police officer supervisors at the time of the events giving rise to this matter. These Defendants were responsible for investigating crimes, including the crime at issue in this case, and/or for supervising other police officer Defendants who investigated the crime at issue. They committed, facilitated, and approved the constitutional violations at issue in

this case and/or knew about the corruption of the other Defendant police officers but concealed that evidence from Plaintiff specifically and others generally.

14.    Defendant City of Boston, Massachusetts is a municipality of the Commonwealth of Massachusetts, which oversees the Boston Police Department. Boston Police Defendants referenced above were employed by the City of Boston or were acting as agents of the City of Boston and/or the Boston Police Department while conducting the investigation described in this Complaint. Defendant City of Boston is responsible for the policies and practices of the Boston Police Department that were implemented by Defendants in this case. Finally, Defendant City of Boston is responsible for any judgment entered against Defendants.

15.    At all times relevant to the events described in this Complaint, each of the Defendants identified above acted under color of law, within the scope of his employment, and as an investigator.

16.    Each of the Defendants is sued in his individual capacity, unless otherwise noted.

## FACTS

### The Edwards Murder

17.    On June 25, 1994, Ryan Edwards was fatally shot once while sitting in the driver's seat of a car in Boston, Massachusetts.

18.    Plaintiff was in the backseat of the car when Mr. Edwards was shot. Plaintiff did not shoot Mr. Edwards. Rather, someone from outside of the car shot Edwards.

19.    No physical evidence ever tied Plaintiff to Edwards' murder, nor was there any physical evidence that Edwards was robbed, as claimed by the Commonwealth.

20.    Although mortally wounded, Edwards was alive long enough to talk to the police. Edwards told Defendant Black that he was shot by someone who was standing outside of his car, not someone inside the car.

21.    Edwards did not tell Black or anyone else that Plaintiff had shot him.

22.    Edwards did not tell Black or anyone else that Plaintiff had robbed him.

23.    Standing outside of Edwards' car when Edwards was shot was Alford Clarke, a drug dealer and Edwards' half-brother.

24.     Clarke fled the scene after the shooting and hid a handgun that he had during the incident.

25.    Edwards' dying declaration to Black that someone outside of the car shot him, without naming Clarke, was an effort to shield his half-brother from being implicated while also identifying the location of the fatal gunshot.

26.    Edwards was subsequently taken to the hospital where he died from a single gunshot wound.

**Disgraced Boston Police Officer Defendant Brazil Takes Charge**

27.    After Edwards made his exculpatory statements, Boston Police Detective Defendant John Brazil arrived on scene to take over the investigation.

5

28.    Unknown to Plaintiff at the time, but known to Defendant City of Boston, Brazil was part of a group of Boston police officers who routinely stole money from crime scenes, falsified evidence (including in sworn affidavits), and shook down drug dealers.

### Brazil and other Defendants Fabricated Inculpatory Evidence and Suppressed Exculpatory Evidence

29.    Brazil's unchecked and unlawful abuse of his police power by the City of Boston were on full display in the investigation of the Edwards murder.

**a.    Brazil stole money from the scene, thereby fabricating evidence of theft and hiding physical evidence.**

30.    A quantity of money in Edwards' possession was found inside Edwards' car. Brazil stole that money, without submitting it for inventory, and concealed the amount of the money.

31.    Brazil admitted that he routinely stole money from crime scenes, such as this one.

32.    Brazil also went to the hospital where Edwards was taken and tampered with evidence there. Edwards' clothes were removed from him at the hospital, and it was Brazil's job to recover those clothes.

33.    But Brazil did not recover Edwards' clothes. This destroyed important exculpatory evidence. First, those clothes contained money—and it was Brazil's *modus operandi* to steal money from crimes. By taking the money, it denied Plaintiff the ability to undermine the Commonwealth's claim that Edwards was killed as part of a robbery. Second, Edwards' clothes would have provided physical

evidence supporting Edwards' dying declaration that he was shot from outside the car because the clothes would not have had gunshot residue on them.

34.    Despite knowing the misconduct, no supervisor from the Boston Polie Department ever held Brazil accountable for removing the clothes or stealing the money from Edwards.

35.    Defendant Brazil fabricated evidence of recovering a lesser amount of money from Edwards (thereby implicating Plaintiff in a theft). This false amount was used against Plaintiff to support the Commonwealth's false claim that Plaintiff had robbed Edwards.

36.    Defendants, including Defendant Brazil, also fabricated the recovery of an incriminating beeper from Edwards' car, which was also used against Plaintiff.

**b.    Defendants hid physical evidence from the car.**

37.    Further physical evidence from inside the car was also destroyed by Brazil and the other investigators—the car was released without any gunshot residue testing from inside the car.

38.    The Commonwealth claimed that Plaintiff shot Edward from inside of the car. This would have generated substantial physical evidence of a gunshot discharge. Defendants denied Plaintiff of that physical evidence by releasing the car without testing it.

**c.    Brazil attempted to shake down Clarke rather than solve the crime, thereby framing Plaintiff.**

39.    Consistent with his unchecked history of stealing from drug dealers, Brazil attempted to forge an alliance with Clarke, thereby making Plaintiff the suspect.

40.    After hiding his handgun, Clarke returned to the scene of the shooting and spoke with Brazil.

41.    Clarke admitted to Defendants Brazil and Mahoney that he had a handgun outside of Edwards' car when Edwards was shot.

42.    Defendants ignored those admissions and instead focused on Clarke's drug-dealing. Defendant Brazil pressured Clarke to tell him where he kept his drug and money stash so that Brazil could use it for his own purposes.

43.    The conversation between Clarke and Defendants Brazil and Mahoney was only partially recorded. What was said in those unrecorded sessions was exculpatory to Plaintiff because it would have revealed Brazil's intentions to use Clarke to enrich himself rather than solve Edwards' murder. To do so, Defendant Brazil would need Clarke free on the streets rather than behind bars for Edwards' murder.

**d.    Brazil fabricated evidence to protect Clarke.**

44.    Clarke admitted to Defendants Brazil and Mahoney that the handgun he had during the murder was the same caliber as the bullet that killed Edwards.

45.     Brazil and other Defendants, including but not limited to Defendants Foley and Mahoney, hid that evidence until trial and then fabricated a story to explain that damning evidence to the jury.

46.     Defendant Brazil expressly fabricated a story that Clarke had traded away the incriminating handgun *before* Edwards murder.

47.     Defendant Brazil's false story included a false claim that Andrew Neals admitted to him that he had made the trade. Brazil wrote no police report about this false conversation.

48.     The false story about the Neals conversation was further undermined by another criminal case that Neals had in which he admitted to getting his handgun from someone else entirely—not Clarke.

49.     Defendant Brazil also protected Clarke by fabricating a story that Clarke's handgun had been thrown away, thereby preventing any ballistics evidence from it—including whether it was the matching caliber and/or the bullet that killed Edwards was fired from that gun.

### Defendants Fabricated Evidence from a Co-Defendant

50.     Defendants threatened Plaintiff's co-defendant, Jamal Butler, to coerce him to provide false evidence against Plaintiff.

51.     Defendants, including but not limited to Defendants Brazil and Manning threatened Erica Jones to testify consistent with the Commonwealth's theory of the case and not provide evidence to support that Clarke was the shooter.

## Defendants Hid Additional Exculpatory Evidence

52.    To shield their misconduct, Defendants had to hide the exculpatory evidence that Plaintiff could have used to defend himself from the false charges.

53.    One step in doing so was the failure by Defendants to draft police reports (or to destroy drafted police reports) that would document exculpatory evidence for Plaintiff that was uncovered during the investigation and to otherwise shield that the evidence used against Plaintiff was fabricated.

54.    Defendant Black, either alone or in concert with other Defendants did not completely document Edwards' dying declarations that were exculpatory for Plaintiff, misstated those dying declarations, and/or minimized his interactions with Edwards to aid the wrongful prosecution of Plaintiff.

55.    Defendant Foley—who investigated the ballistics in Plaintiff's prosecution (that did not include testing the car)—failed to disclose that he had been on leave because he had lied previously in an investigation and there were ongoing concerns about his mental health and his ability to know truth from fiction. Instead, he characterized his absence as an "injury."

56.    Defendant Mahoney failed to disclose that he had previously committed misconduct in investigating crimes that had resulted in wrongful arrests and/or convictions.

57.    Clarke was not a United States citizen and he was taken into immigration custody to be deported before Plaintiff's trial.  Clarke was set to be deported.

58.     Defendant Brazil used the threat of deportation to coerce Clarke to testify in a manner that would not reveal Defendant Brazil's misconduct.

59.     Defendants failed to disclose that Defendant Brazil tampered with the money evidence in this case, stealing money that had been in Edwards' possession and car to support the false claim that Edwards was robbed. Defendants further failed to disclose that Detective Brazil then eventually substituted in a smaller quantity of money from a different case or a different source when such evidence became necessary for Plaintiff's trial. Defendants also failed to disclose that this type of misconduct was Defendant Brazil's *modus operandi.*

60.     Defendants, including Defendant City of Boston, failed to disclose that Defendant Brazil had falsified affidavits and evidence in other cases or that he had failed to correctly document money and had stolen money from other criminals and crime scenes before (and after) Plaintiff's trial.

61.     Defendants, including Defendant City of Boston, failed to disclose that Brazil was engaged in an ongoing conspiracy, a pattern of egregious misconduct along with several other detectives, with such misconduct involving falsifying search warrants, lying in investigations, failing to report seized cash, stealing money from criminals and crime scenes, ripping off drug dealers, making deals with criminals and their lawyers, reporting that less money was recovered from crime scenes than they actually recovered so they could keep money, and retroactively trying to substitute in different money if anyone important ever came looking for missing money, which is what Brazil did in Plaintiff's case.

62.     Defendants, including Defendant City of Boston, failed to disclose that Defendant Brazil promised Clarke immigration assistance in exchange for his testimony.

63.     Defendants, including Defendant City of Boston, failed to disclose Defendants Brazil, Foley, and Mahoney's exculpatory internal affairs and personnel records.

**Plaintiff's Arrest, Wrongful Conviction, and Imprisonment**

64.     On November 14, 1994, based on Defendants' falsified evidence and withheld/destroyed exculpatory evidence, Plaintiff was indicted for murder, two counts of armed robbery (for allegedly robbing Edwards and Clarke), and unlawful carrying of a firearm without a license (for allegedly possessing the gun that killed Edwards, which police never found and that Plaintiff never possessed).

65.     Plaintiff contested guilt at every stage of his arrest and prosecution.

66.     Prior to trial, Plaintiff sought all exculpatory evidence from the Commonwealth.

67.     During the trial, the false evidence described above was the only thing suggesting that Plaintiff was guilty of murder, armed robberies, and possession of a weapon.

68.     Moreover, Plaintiff was unable to defend himself because he was denied access to the exculpatory evidence described above.

69.     As a result of the suppression of the exculpatory evidence, Plaintiff was unable to rebut the prosecutor's sole argument against Plaintiff—that the murder stemmed from an armed robbery attempt.

70.     Had Plaintiff had the exculpatory evidence described above, he would have been able to establish that there was no armed robbery and that he did not possess the murder weapon.

71.     Likewise, had Defendants disclosed the exculpatory evidence they suppressed, Plaintiff never would have been arrested, let alone convicted.

### Plaintiff's Damages

72.     Plaintiff was 21 years old—in the prime of his life—when he was wrongly arrested and convicted.

73.     He would spend the next 26 plus years imprisoned for something he had not done.

74.     Plaintiff's whole life was turned upside down without any warning.

75.     Because of Defendants' misconduct, Plaintiff has missed out on participating in the lives of his family and friends.

76.     Plaintiff was also deprived of opportunities to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Plaintiff was deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as anautonomous human being.

77.     During his decades of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in maximum security prisons. He was physically injured and assaulted numerous times, some of which resulted in painful medical treatment.

78.     Plaintiff was forced to rely on his imprisoners to meet his basic needs. Among other hardships, he had difficulty getting medical care while he was in prison. Plaintiff had to wait long periods to obtain needed medical attention. Even when he received medical care, it was often substandard.

79.     His unlawful arrest, prosecution, and imprisonment caused him to suffer from mental and physical health problems, which continue to this day.

80.     In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, Defendants' misconduct continues to cause Plaintiff ongoing health effects.

### Plaintiff's Exoneration

81.     Plaintiff always proclaimed his innocence. During the criminal trial, he rejected a guilty plea to a lesser charge because he refused to concede that he was involved in any way in the Edwards murder.

82.     On or about September 2, 2021, Plaintiff filed a third Motion for a New Trial seeking to vacate all his convictions.

83.     The Suffolk County District Attorney's Office agreed that Plaintiff's murder and robbery convictions should be vacated.

84.    On December 7, 2021, the motion judge (the Honorable Ullmann, J.) granted a new trial as to the murder and robbery convictions.

85.    That same date, the Suffolk County District Attorney's Office filed a *nolle prosequi* as to the murder and robbery indictments.  Plaintiff was released from prison that same day after more than 26 years of wrongful confinement.

86.    On or about January 12, 2023, Plaintiff filed a Motion for a New Trial seeking to vacate his firearm possession conviction, which was based on him allegedly shooting Edwards.

87.    The Suffolk County District Attorney's Office agreed that Plaintiff's firearm possession conviction should be vacated.

88.    On or about August 3, 2023, the motion judge (the Honorable Ullmann, J.) granted a new trial as to the firearm possession conviction.

89.    On that same date, the Suffolk County District Attorney's Office filed a *nolle prosequi* as to the firearm possession indictment.

90.    Each of Plaintiff's convictions are now vacated and dismissed, Plaintiff has been exonerated, and Defendants misconduct and violations of Plaintiff's civil rights have been revealed.

## COUNT I
## 42 U.S.C. § 1983 – Due Process

91.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

92.    In the manner described more fully herein, Defendants, while acting as investigators, individually, jointly, and in conspiracy with one another, as well as

under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

93.    Defendants deliberately withheld exculpatory evidence from Plaintiff and from state prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

94.    Defendants fabricated and solicited false evidence, including testimony that they knew to be false, implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

95.    In addition, Defendants produced a series of false and fraudulent reports and related documents, which they inserted into their file and presented to state prosecutors and judges. These documents, which were used to show Plaintiff's purported connection to the crime, contained statements and described events that were fabricated, and that Defendants knew to be false. Defendants signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was false.

96.    In addition, Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

97.    Defendants who were supervisors charged with overseeing the investigation and the other Defendants knew full well of this misconduct, the suppression of exculpatory evidence, and the fabrication of a false case against Plaintiff. These supervisors nevertheless intentionally ignored Defendants'

misconduct, and decided to make Plaintiff responsible for a crime he did not commit, rather than directing the officers to go out and fully investigate the murder.

98.    Defendants' misconduct directly resulted in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

99.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and/or in total disregard of the truth and Plaintiff's clear innocence.

100.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

101.    Plaintiff's injuries were caused by the official policies of Defendant City of Boston and the Boston Police Department, by the practices and customs of Defendant City of Boston, the Boston Police Department and by the actions of final policymaking  officials for Defendant City of Boston, and theBoston Police Department. For example, the Boston Police Department maintained an unwritten custom or policy to not investigate exculpatory evidence and to withhold it from criminal defendants.

102.   Mr. Lucien's wrongful conviction further resulted from the failure to supervise and train Boston police officers regarding the proper handling of exculpatory evidence and the government's obligation to disclose it to criminal defendants. The City's failure to supervise and train its officers showed deliberate indifference to the risk that an innocent person like Mr. Lucien would be convicted of a crime he did not commit.

103.   On November 17, 1993, Defendant McNelley gave Defendant Joseph Dunford written notice that Defendant Foley had provided "false" information in an investigation and concluded that "Foley was unable to perform his duties."

104.   Defendant Bratton was also on express written notice that Foley was unable to honestly investigate alleged crimes.

105.   On November 23, 1993, Defendant Saia gave Defendant Bratton written notice that Defendant Foley had provided "false" facts regarding the murder of Boston police officer John Mulligan. Defendant Saia told Bratton that Foley had "lost contact with reality."

106.   On December 2, 1993, just months before Foley's involvement in the "investigation" that led to Plaintiff's wrongful arrest and conviction, Defendant Robert Dunford advised Defendant Bratton in writing that Defendant Foley could not be trusted to investigate cases. That written notice included statements to Bratton that: (1) "Detective Foley's actions were the product of a man whose mental capacity to differentiate between fact and fiction was severely diminished due to overwhelming stresses caused by personal family, financial, and physical collapse

caused by alcohol abuse, physical and nutritional exhaustion."; (2) "Detective Foley in this dissociated state saw an opportunity to reverse what he must [have] felt as a lack of self-esteem and to become a hero in the eyes of the only 'family' he had left, the Police Department."; Foley was "a very ill man." The written notice went on to recommend that Foley be given "no investigative functions."

107.    Despite this express notice, the supervisors including but not limited to Defendants McNelley, Joseph Dunford, Saia, Robert Dunford, and Bratton took no action regarding Foley or the other officers and/or allowed them to conduct investigations and engage in the misconduct that led to Plaintiff's wrongful arrest and prosecution.

108.    At all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Boston promulgated rules, regulations, policies, and procedures governing witness interviews, photo lineups, live lineups, preservation and disclosure of investigative materials and evidence, questioning of criminal suspects, in-court testimony, preparation and presentation of witness testimony, and training, supervision, and discipline of employees and agents of the City of Boston, including employees and agents of the Boston Police Department.

109.    These rules, regulations, policies, and procedures were implemented by employees and agents of Defendant City of Boston, including the Defendants, who were responsible for conducting investigations of crimes in and around Boston, Massachusetts.

110.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, Defendant City of Boston had notice of a widespread practice by its officers and agents under which individuals suspected of criminal activity, such as Plaintiff, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

111.    Defendant Brazil was the subject of multiple complaints of misconduct so that Defendant City of Boston and/or its supervisors were on notice that he posed the exact risk that occurred here—the fabrication of inculpatory evidence and the hiding/destruction of exculpatory evidence. Despite that notice, the City of Boston and/or its supervisors did nothing to reign in Brazil or other investigators.

112.    Defendant Foley had been on leave for lying previously in criminal investigation and for suffering mental health issues in which it was determined that he had trouble knowing truth from fiction. Defendant City of Boston and/or its supervisors were aware of all of these issues and on notice that he posed the exact risk that occurred here—the fabrication of inculpatory evidence and the hiding/destruction of exculpatory evidence. Despite that notice, the City of Boston did nothing to reign in Foley or other investigators.

113.    Defendant Mahoney had previously committed misconduct in investigating crimes that had resulted in wrongful arrests and/or convictions.

Defendant City of Boston and/or its supervisors were aware of all of these issues and were on notice that he posed the exact risk that occurred here—the fabrication of inculpatory evidence and the hiding/destruction of exculpatory evidence. Despite that notice, the City of Boston did nothing to reign in Mahoney or other investigators.

114.    The City of Boston had a policy or custom of indifference to misconduct by Boston police officers by failing to properly investigate complaints of misconduct and to discipline officers who engaged in misconduct.

115.    The City of Boston also had a policy or custom of tolerating a "code of silence" or a "blue wall" in which Boston police officers understood that they were not to report misconduct by fellow police officers.

116.    This policy or custom existed in the early 1990s, before Plaintiff's wrongful arrest and prosecution. The recently publicized scandals involving Commissioner Dennis White and union president Patrick Rose demonstrate the power of the code of silence. Both officers were investigated for serious misconduct (domestic abuse and sexual abuse of children, respectively) in the 1990's, but officers protected them.

117.    That same protection extended to Defendant Brazil, who brazenly engaged in repeated thefts of suspects, thefts at crime scenes, the fabrication of evidence, and providing false evidence under oath. Brazil knew that he could get away with this misconduct because the City of Boston would turn a blind eye to it.

It was only after the federal government became involved that any accountable was done, but not by the City of Boston, which continues to pay John Brazil. It also extended to Defendants Foley and Mahoney, who each were allowed by the City of Boston to infect criminal investigations through fabrication of evidence and/or other misconduct.

118.    Before and during Plaintiff's trial, the "blue wall" or code of silence prevented Boston police officers from truthfully reporting misconduct. For instance, before and during Plaintiff's criminal trial, the beating of Michael Cox, a Black undercover police officer, by other Boston police officers who did not realize he was a fellow officer. This incident resulted in a successful civil suit and a book, *The Fence*, by Dick Lehr. This demonstrates that police-on-police misconduct was not above being shielded by Boston Police Department officers through the code of silence or blue wall. It was truer that those same officers would protect their own, like Defendants Brazil, Foley, and/or Mahoney, when it came to unlawful conduct against non-police officers. Defendant City of Boston was aware of this issue and did nothing to prevent it.

119.    On May 14, 2021, Boston Mayor Kim Janey admitted that, "a blue wall of silence was confirmed" in the course of an investigation related to former Commissioner White. She said, "officers were intimidated into silence for fear of retaliation" during the investigation into allegations against Commissioner White stemming from the early 1990s, which is when misconduct occurred leading to Plaintiff's wrongful conviction.

120.    The Boston Police Department also had a custom of making it difficult for citizens to file complaints about the conduct of Boston police officers. The Boston Police Department's own review board found that there "is a strong perception that citizens do not have easy access to filing complaints in supportive and non-intimidating environments."

121.    The Internal Affairs Division of the BPD has, for many years, had a practice of delaying findings on investigations of officer misconduct. This delay allowed misconduct to go unpunished since the civilian complainants often cannot be found or have lost interest in the complaint.

122.    And even when investigations revealed misconduct against officers, including but not limited to Defendants Brazil, Foley, and Mahoney, the Boston Police Department and/or the supervisors who had knowledge took no steps to increase supervision of those officers, create added safeguards, and/or to remove them from their positions. The Boston Police Department and/or the supervisors also concealed the misconduct generally and from Plaintiff specifically. This enabled those officers to reoffend, which is what happened here in the fabrication and/or suppression of exculpatory evidence that led to Plaintiff's wrongful conviction.

123.    The policies and customs of the City of Boston described above were the moving force behind the actions of Defendants. They knew they could act with virtual impunity because they would not face a real risk of discipline or intervention by fellow officers or supervisors.

124.    These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City of Boston directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and discipline their officers, agents, and employees who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

125.    The above-described widespread practices, which were so well settled as to constitute the *de facto* policy of the City of Boston, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

126.    Plaintiff's injuries were caused by Defendants, many of whom were officers, agents, and employees of the City of Boston, and the Boston Police Department including but not limited to the individually named Boston Police Defendants, who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT II
## 42 U.S.C. § 1983 – Federal Malicious Prosecution

127.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

128.    In the manner described above, Defendants, acting as investigators, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings

against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

129.    In doing so, Defendants caused Plaintiff to be unreasonably seized without probable cause and deprived of his liberty, in violation of Plaintiff's rights secured by the Fourth and Fourteenth Amendments.

130.    The false judicial proceedings against Plaintiff were instituted and continued maliciously, resulting in injury.

131.    Defendants deprived Plaintiff of fair state criminal proceedings, including the chance to defend himself during those proceedings, resulting in a deprivation of his liberty, and Massachusetts law does not provide an adequate state-law tort remedy to redress that harm.

132.    In addition, Defendants subjected Plaintiff to arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through Defendants' fabrication and suppression of evidence.

133.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

134.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

135.    All judicial proceedings against Plaintiff wereterminated in his favor, in a manner indicative of his innocence.

136.    Boston Police Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Boston, and by Defendants who were final policymakers for Defendant City of Boston, in the manner more fully described above.

## COUNT III
### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

137.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

138.    After the Edwards murder, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for murder, a crime he did not commit, and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

139.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

140.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

141.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

142.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

143.   Boston Police Defendants' misconduct described in this Count was undertaken under the policies, practices, and customs of Defendant City of Boston, and by Defendants who were final policymakers for Defendant City of Boston, in the manner more fully described above.

## COUNT IV
## 42 U.S.C. § 1983 – Failure to Intervene

144.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

145.   In the manner described above, during the constitutional violations described herein, one or more Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

146.   As a result of Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress and permanent physical damage. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

147.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

148.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

149.    Boston Police Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Boston, and by Defendants who were final policymakers for Defendant City of Boston, in the manner more fully described above.

## COUNT V
## Intentional Infliction of Emotional Distress

150.    Plaintiff incorporates each paragraph of this Complaint as if full restated here.

151.    As a proximate result of the initiation of the prosecution of James Lucien for the Edwards murder without probable cause and with malice by defendants, Plaintiff was convicted and imprisoned for over 26 years.

152.    The acts and omissions of defendants in initiating the prosecution of Plaintiff was made without probable cause. Fabricating evidence and withholding exculpatory evidence to convict an innocent man is extreme and outrageous conduct, beyond all possible bounds of decency and utterly intolerable in a civilized community.

153.    Defendants' acts and omissions caused Plaintiff to suffer severe emotional distress of a nature that no reasonable person could be expected to endure as described above.

154.    These actions constitute the tort of intentional infliction of emotional distress under Massachusetts law.

155.    As a result of the Defendants' intentional infliction of emotional distress, Plaintiff has suffered damages as described above.

156.    Defendants are liable to the Plaintiff for injuries and damages resulting from the fact that by their acts and omissions alleged herein, they intentionally inflicted emotional distress upon the Plaintiff.

## COUNT VI
## State-Law Claim – Malicious Prosecution

157.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

158.    In the manner described above, Defendants, acting as investigators, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and despite that they knew Plaintiff was innocent.

159.    In so doing, Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

29

160.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

161.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

162.    All judicial proceedings against Plaintiff were terminated in his favor.

## COUNT VII
## State-Law Claim – Negligence

163.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

164.    Defendants owed Plaintiff a duty to refrain from framing him for a crime he had not committed and to conduct a legal and thorough investigation that resulted in the accurate identification, arrest, and prosecution of criminal suspects.

165.    In the manner described more fully above, the actions, omissions, and conduct of Defendants breached this duty.

166.    The misconduct described in this Count was objectively unreasonable and was undertaken in total disregard of the truth and Plaintiff's clear innocence.

167.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
### State-Law Claim – Negligent Infliction of Emotional Distress

168.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

169.    Pleading in the alternative, Defendants owed Plaintiff a duty to refrain from framing him for a crime he had not committed and to conduct a legal and thorough investigation that resulted in the accurate identification, arrest, and prosecution of criminal suspects.

170.    In the manner described more fully above, the actions, omissions, and conduct of Defendants breached this duty.

171.    The misconduct described in this Count was objectively unreasonable. It was reasonably foreseeable that Defendants' actions would cause any reasonable person, including Plaintiff, emotional distress.

172.    As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer physical injury, emotional distress, and other grievous and continuing injuries and damages as set forth above. His distress is manifested in multiple symptoms such as deep depression and anxiety.

## COUNT IX
### State-Law Claim – Mass. Gen. Laws, Ch. 12, § 11I

173.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

174.    Defendants interfered with Plaintiff's exercise and enjoyment of rights guaranteed to him by the U.S. Constitution and the constitution and laws of the

Commonwealth of Massachusetts by fabricating evidence and coercing witnesses into fabricating false evidence against Plaintiff.

175.    Defendants' misconduct deprived Plaintiff of his rights under federal and state law by use of threats, intimidation, and coercion, thereby violating the Massachusetts Civil Rights Act.

## COUNT X
## State-Law Claim – Civil Conspiracy

176.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

177.    As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

178.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

179.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

180.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and

damages as set forth above.

**COUNT XI**
**State-Law Claim – Negligent Supervision/Retention**

181.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

182.   During the course of Defendant Brazil, Foley, Mahoney's employment, their supervisors and the City of Boston became aware or should have become aware of problems with those employees that indicated their unfitness to act as police officers.

183.   The City of Boston and its supervisors failed to take further action such as investigating, discharging, or reassigning those employees from positions that could cause the violation of citizens' rights.

184.   In the manner described more fully above, the actions, omissions, and conduct of Defendants breached this duty.

185.   As a direct and proximate result of Defendants' actions, Plaintiff suffered and continues to suffer damages as described above.

WHEREFORE, Plaintiff, JAMES LUCIEN, respectfully requests that this Court enter a judgment in his favor and against the BOSTON POLICE OFFICERS JOHN BRAZIL, GEORGE FOLEY, WILLIAM MAHONEY, BRIAN BLACK, ROBERT MANNING, WILLIAM BRATTON, JOSEPH V. SAIA, Jr., ROBERT P. DUNFORD, JOSEPH DUNFORD, EDWARD J. McNELLEY, HAROLD C. PREFONTAINE, UNKNOWN BOSTON POLICE OFFICERS, and the CITY OF BOSTON, awarding compensatory damages, attorneys' fees and costs against each

Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

### JURY DEMAND

Plaintiff, JAMES LUCIEN, hereby demands a trial by jury under Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

JAMES LUCIEN

BY:    /s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*

Mark Loevy-Reyes, BBO No. 707974
Margaret Gould*
LOEVY & LOEVY
398 Columbus Avenue, Suite 294
Boston, MA 02116
(312) 243-5900
mark@loevy.com
*Admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I, Mark Loevy-Reyes, an attorney, hereby certify that on October 15, 2024, I filed the foregoing Plaintiff's AMENDED COMPLAINT using the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Mark Loevy-Reyes
*One of Plaintiff's Attorneys*